**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | |
|---|---|---|
| **JACQUELINE WILLIAMS,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:21-cv-02569-JTF-tmp** |
| | ) | |
| **MEMPHIS LIGHT, GAS & WATER DIVISION,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTIONS
TO STRIKE AND GRANTING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT**

Before the Court are three motions, all filed by Defendant Memphis Light, Gas & Water Division ("MLGW"). First is a Motion for Summary Judgment, filed on October 31, 2022. (ECF No. 46.) Plaintiff Jacqueline Williams filed a Response in opposition to this Motion on December 19, 2022. (ECF No. 53.) Williams attached numerous exhibits to that response, including two declarations: one from herself, (ECF No. 53-14), and one from Roy Johnson, (ECF No. 53-16), a union steward at her job. On January 17, 2023, MLGW filed Motions to Strike both of those declarations. (ECF Nos. 60 & 61.) Williams filed Responses in opposition to those motions on February 7, 2023. (ECF Nos. 66 & 67.) For the following reasons, the Court finds that the Motions to Strike should be **GRANTED IN PART** and **DENIED IN PART** and that the Motion for Summary Judgment should be **GRANTED**.

## I.   **FACTUAL AND PROCEDURAL HISTORY**

### 1.  *Factual Background*

Plaintiff Jacqueline Williams was hired by MLGW as a Clerical Support II (a "Clerk") in the Transformer and Electronic Motor Shop on September 2, 2012. (ECF No. 54, 1.) Her first supervisor was Tim Mannon, who she worked under for six months before he retired. (ECF No. 59, 3.) After this, she began being supervised by Chris Rutledge. (*Id.* at 3-4.) Her relationship with Rutledge was "pretty good" but a few disciplinary "occurrences" arose while she was supervised by him. (*Id.*)

First, Rutledge gave Williams a 2 out of 5 (with 5 being the highest) score for "cooperation" on her 2013-2014 performance review. (*Id.* at 2; ECF No. 47-3, 2.) Williams submitted this review to her union's collectively bargained grievance process and received a revised review after a first stage grievance hearing held with Rutledge on March 31, 2014. (ECF No. 47-4, 5.) In the revised performance review, Rutledge gave Williams a 4 out of 5 in cooperation and noted that "She works well with others." (*Id.* at 3.) He concluded the review by noting that "though we had some issues earlier last year, Jackie has improved greatly on these and other aspects of her job. She is a valuable asset to my office. Thank you and keep up the good work." (*Id.* at 4.)

Second, in October 2014, Rutledge gave Williams a written reprimand for insubordination. (ECF No. 54, 2.) The insubordination occurred when a separate Clerk, Elizabeth Evans, went on vacation the week of October 13, 2014. (ECF No. 47-5, 1.) Evans requested that Williams enter the timecards of the employees Evans was responsible for into MLGW's timekeeping system while she was gone. (*Id. at* 2.) Williams requested assistance with entering the time from another employee named "Carla," but Rutledge replied that Carla was on another

assignment and could not assist. (*Id.*) According to the reprimand, by October 20 none of the time had been entered and the relevant cards had merely been placed on Evans's desk, and then placed back there even after Rutledge had moved them back to Williams' desk. (*Id.* at 1.) In a portion of her declaration that MLGW seeks to strike, Williams states that she was not allowed to work overtime to enter the cards and that management had previously promised her another clerk would help enter the time. (ECF No. 53-14, 1.) She denies having moved the cards as well. (*Id.*) She further states that she grieved this reprimand and received a settlement in her favor after a Step 4 arbitration hearing held in October 2016. (*Id.* at 2.) No records of such a settlement were submitted to the Court, but a copy of the grievance form appears in the record. (ECF No. 47-5, 5.)

Third, on January 21, 2016, an employee named Phillip Miller filed an internal complaint of harassment against Williams. (ECF No. 47-7, 2.) An investigation was initially performed by MLGW Human Resources ("HR") Representative Paula Mitchell and concluded by Senior HR Representative Virginia Leonard on November 16, 2016. (*Id.*) According to the investigation report, Miller alleged that Williams refused to let him use a label maker or provide him with keys to a company truck and accused him of writing "witch" on a United Way poster that featured Williams. (*Id.*) Further, Miller alleged that Williams' brother had called Miller's minister and complained about Miller's treatment of Williams. (*Id.*) The investigation resulted in a finding that Williams had violated Labor Relations Bulletin #104. Williams received a warning that "the Division will not tolerate any future behavior that is in violation of the above referenced Bulletins." (*Id.* at 2-3.) Williams grieved the investigation findings, but the warning was not rescinded. (ECF No. 54, 5.) Williams states that Miller's complaint was made in retaliation for

multiple complaints she had filed against him. (*Id.* at 4.) In her deposition, Williams authenticated three different grievances she had filed against Miller. (ECF No. 47-1, 45 – 47.)

Fourth, on April 28, 2017, another coworker named Dietrick Smith filed an internal harassment complaint against Williams. (ECF No. 54, 6.) Smith alleged that Williams was harassing him based on his sexual orientation and that she "made allegations against him which could have jeopardized his employment." (ECF No. 47-3, 2.) An investigation into this charge was done by Labor and Employee Relations Manager Angela Hewlett. (*Id.*) In a letter sent to Williams, Hewlett stated that "the evidence gathered supports the allegation that your behavior of pervasive use of profanity, name-calling, and demeaning behavior towards Mr. Smith and others in the area has created a hostile work environment." (*Id.*) Citing the previous warning that resulted from Miller's complaint, MLGW placed Williams on a five-day suspension, equaling a loss of pay of $767.60. (*Id.*) Williams denied Smith's charges. In a challenged portion of her declaration, Williams states that Smith's charges against her were in retaliation for her not agreeing to cover up Smith's alleged chronic tardiness. (ECF No. 53-14, 3.)

Williams left Rutledge's supervision on December 18, 2017, when she was moved into a new position as a Clerical Support III at MLGW's Hickory Hill Service Center. (ECF No. 54, 8 – 9.) There, she reported to Supervisor Michael Page and Shift Supervisor Keith Newbern. (*Id.* at 9.) Her job duties included "preparing forms, verifying and maintaining area daily time, monitoring and processing customer calls, developing working relationship with customers, receiving and directing customer calls, relaying messages, scheduling supervisor meetings; and performing other duties as directed." (*Id.*)  It appears employment proceeded without issue for around five months.

Starting in April 2018, the parties' accounts differ significantly. The parties agree that in April, Page asked Williams to participate in the performance evaluation process. (ECF No. 54, 9.) Williams states that Page "wanted her to fill [performance evaluation forms] out completely" while MLGW states Page asked her to "help" complete them. (*Id.*) Regardless of the extent of the help requested, Williams told Page she was uncomfortable participating in the process.  Page told her to participate anyway. (*Id.* at 10.) On April 24, 2018, Williams emailed Paula Mitchell in HR with complaints about Newbern and Page, stating they (1) had "created a hostile work environment in the department with the employees," (2) had been giving her "dirty looks," (3) had spoken badly about her to other employees, and (4) that Newbern specifically was being "very threatening towards the employees." (ECF No. 47-12, 5.) Regarding statements to other employees, Williams alleged Newbern had told Nakia Rutherford, a coworker, that she was a "trouble maker" and a "problem," and alleged Page had told Ulysses Lewis, another coworker, that she was "mad and upset." (*Id.*) Williams wrote that "[a]ll of this animosity towards me stem[s] from me not feeling comfortable doing their supervisor job duties." Williams explained Page and Newbern had repeatedly asked her to complete performance evaluations that she refused to do. (*Id.*) Williams later wrote to Mitchell that she had met with an unspecified union steward and manager Clint Richardson and had decided there would be a "separation cool down" period where she would report to the Netters office rather than Hickory Hill for a "temporarily/short term." (*Id.* at 3.) She also requested Mitchell file a formal complaint and begin an investigation of her allegations against Newbern and Page. (*Id.*)

On May 3, 2018, Williams filled out a formal charge against Newbern and Page. (ECF No. 47-14.) When asked to identify the basis of discrimination she faced, she checked a box labelled "sex." (*Id.* at 2.) When asked to identify the nature of the charge, she circled "harassment"

from a list of options and identified Keith Newbern and Mike Page as responsible. (*Id.*) She stated

the harassment had occurred on April 13, 2018, and listed Nakia Rutherford as the only witness.

(*Id.*) The only account of the harassment provided in the charge was a typed one-page statement

signed by Rutherford:

> I Nakia Rutherford was approached by the Shift Supervisor of Customer Service
> Field Operations, Keith Newbern on April 13 to follow him outside. Once we got
> outside he stated to me that I should watch talking to Jacqueline Williams (Clerk,
> Customer Service) because she is a troublemaker, a problem and she filed charges
> on people. He advised me to not interact with her. This conversation with Keith
> Newbern made me very uncomfortable.

(*Id.* at 5.) In his deposition, Newbern stated he did not remember a conversation with Rutherford.

(ECF No. 53-2, 43 – 44.) When asked about her desired relief, Williams stated "the main violator

is Keith Newbern, who should be moved to avoid creating more hostile environments with or

among employees. He's also creating isolation among employees." (ECF No. 47-14, 5.)

Paula Mitchell and Corporate Security Officer Alonsia Hardy investigated the charge.

(ECF No. 54, 15.) Mitchell interviewed Rutherford as part of this investigation. Rutherford's

interview was largely consistent with his written account. However, he lied about the events

leading up to the conversation with Newbern. Specifically, Rutherford denied he and Williams

had used a company vehicle to drive to lunch together immediately before his conversation with

Newbern.[1] (*Id.* at 15 – 16.)

Williams began reporting to the Netters office in the first week of May 2018. Pursuant to

Clint Richardson's instructions, Williams would drive to Hickory Hill, retrieve a company

vehicle, and then drive the company vehicle to Netters. (ECF No. 47-1, 121.) Newbern and Page

communicated with Williams only via email during this time. (ECF No. 54, 11 – 12.) Page in

---

[1] Apparently, Newbern spoke with Rutherford about not taking company vehicles to lunch and told Rutherford to be careful around Williams "because of this 'Me To [sic] Movement.'" (*Id.* at 4.)

particular continued to assign her work. (*Id.*) Williams interpreted Page's emails as wanting "to make it look like she wasn't doing . . . certain job tasks with the time[.]" (*Id.* at 12.) After roughly a month spent at Netters, Williams emailed a union official asking about the status of her complaint against Newbern and Page and wondering when she would be able to return to Hickory Hill. (ECF No. 47-13, 4.) The union official emailed Clint Richardson on her behalf, and Richardson responded that "the answer as to when she will be allowed to return rest [sic] with her. If she tells me that she now feels comfortable going back we can make it happen." (*Id.* at 3.) Richardson also said he had no control over or updates on the investigation, which was being handled by Human Resources. (*Id.*) On May 31, 2018, Richardson emailed Williams memorializing a phone conversation between the two of them, wherein she had indicated she wanted to return to Hickory Hill. (*Id.* at 2.) She replied: "Yes I'm ready to go back, however I'm depending on you Mr. Richardson as the manager to ensure that I will be working in an environment that is not hostile and to be treated fairly." (*Id.* at 1.) Williams returned to Hickory Hill on June 11, 2018. (ECF No. 47-14, 1.) In her deposition, she stated she desired to return to Hickory Hill because she "did not have access to things to perform my job as well" at Netters. (ECF No. 47-1, 119.)

The month of June appears to have passed without incident. However, the events of July 11, 2018, are heavily contested by the parties and constitute the inciting incident for the case at hand. Williams asserts that on that date she went to the bathroom and missed a phone call. (ECF No. 59, 16.) When she returned to her desk, Newbern approached her and asked why she had missed the call. (*Id.*) Williams explained she had been in the bathroom. (*Id.*) Newbern responded by "berating her and questioning whether she was really in the restroom." (*Id.*) He began yelling at her and stood over her while she sat at her desk. (*Id.*) Williams felt threatened and left the

7

office, but Newbern followed her outside. (*Id.*) Williams ran to the security guard booth in the office's parking lot and called both the police and her union steward. (*Id.* at 16 – 17.) The police responded but no arrests were made and no report was written. (ECF No. 54, 20.)

MLGW disputes Williams' account. The company admits Newbern questioned Williams about answering the phone and that Williams stated she had been in the bathroom but denies Newbern ever raised his voice or behaved in a threatening manner. (ECF No. 59, 16.) They further admit Williams called the police and waited in the security booth until officers arrived. (ECF No. 54, 20.) For his part, Newbern stated in his deposition that he saw Williams ignore a call as he was walking through the office. (ECF No. 53-2, 63.) After briefly attending to other duties, he came back to the office and approached Williams to ask why she did not answer the phone. (*Id.*) Williams then "got up from her desk, walked about ten feet, passed [Newbern], passed the clean-up lady, passed [another employee named] Marshall Foster, and went out the door saying, 'I'm not going to deal with this today, Keith.'" (*Id.*) Newbern denied following Williams out of the office, raising his voice, or behaving threateningly. (*Id.*)

The incident was internally investigated after Williams amended her May 3 charge to include allegations related to the day's events. (ECF No. 54, 20.) The investigation ultimately resulted in a "Corporate Security Investigative Report." (*Id.* at 21.) The report summarizes seven interviews done by Paula Mitchell, an employee named Alonsia Hardy, and an "Officer Davis." (*Id.* at 20.) Williams was interviewed and she provided the account given above, although she initially alleged Marshall Foster approached along with Keith Newbern. (ECF No. 47-4, 2.) A contracted cleaner named Quida Moore largely supported Newbern's account, stating he never became aggressive and that Williams left the office after Newbern repeatedly asked why she had missed the phone call. (*Id.*) Marshall Foster was interviewed and provided an account similar to

Moore's. (*Id.* at 3.) Newbern's account was in line with Moore and Foster's, although he provided additional details relating to Williams' allegations back in April, including that he had talked to Nakia Rutherford about not taking company vehicles to lunch and had told Rutherford to be careful around Williams "because of this 'Me To [sic] Movement.'" (*Id.* at 4.) An employee identified as Kirk Lewis (who is also referred to as "Ulysses Lewis") stated he had never been told not to speak to Williams by either Page or Newbern. (*Id.* at 5.) Rutherford was interviewed as described above and repeated his original story. (*Id.* at 5.) The report concluded:

> After reviewing the written statements and interviewing the employees that were involved with this incident, we found no evidence to substantiate threats, intimidating or violent behavior on behalf of Mr. Newbern. According to witness' statements Mr. Newbern never raised his voice nor followed Ms. Williams as she left the office. Additionally from witness statements, Mr. Newbern was sitting on the end of the desk and walked back into his office when Ms. Williams left the office. It appears that Ms. Williams' statements are inconsistent with the witnesses. After interviewing the witness it appears that Ms. Williams was insubordinate to her supervisor.

(*Id.* at 6.) The report made no recommendations as to discipline. Williams challenges the accuracy of the report due to the lack of recordings and statements made under oath. (ECF No. 54, 20 – 21.) In a letter titled Evidence Rationale for Recommendation drafted at least in part by Paula Mitchell after the report, MLGW recommended suspending Williams for five days. (ECF No. 47-17, 8 – 9.)

On August 23, 2018, Eric Conway, an Employment Services Manager, drafted a letter to Williams suspending her for five days. (ECF No. 47-19.) The letter stated that "the evidence does support false statements were made by you, regarding employees witnessing allegations which you levied against your supervision and false reports were filed with Memphis Light, Gas and Water Corporate Security and the Memphis Police Department against your supervision." (*Id.*) These actions were found to be "a violation of MLGW Human Resource Policy #23-02 Disciplinary Actions . . . in direct opposition to Labor Relations Bulletin #69 Conduct During

Investigations and #104-Fostering Respectful Work Environment." (*Id.*) Williams was suspended from August 31 through September 7, 2018, amounting to a loss of pay of $798.80. (*Id.*)

Williams signed and dated the letter on August 30, 2018. (*Id.*) The two parties dispute the nature of the meeting where Williams was presented with the letter. MLGW states Manager of Labor and Employee Relations Angela Hewlett and Conway himself presented Williams with the letter and evidence against her before informing her of the suspension. (ECF No. 54, 22.) Williams states she was called into a meeting with Hewlett, Conway, Newbern, and union representatives Roy Johnson and Corey Hester, where Hewlett told her of the suspension and accused Williams of lying about feeling threatened. (*Id.*) Williams also alleges Hewlett threatened her, saying "if you have any other issues or concerns once you return, you will be disciplined up until termination." (*Id.*) Williams states the union attempted to arbitrate the issue but that MLGW never set the matter for a hearing, which MLGW denies. (ECF No. 59, 21.)

The next day, Williams filed a Charge with the Equal Employment Opportunity Commission relating to the suspension and previous events. (ECF No. 47-2.) In the Charge, Williams stated:

> On May 3, 2018, I filed an internal complaint of sex discrimination and harassment supported by a male witness' testimony. On August 30, 2018, the company notified me that they believed me and my witness were being untruthful, and suspended me without pay. However, the male witness was not suspended. I believe I was discriminated against because of my sex (female) and retaliated against for filing a protected complaint in violation of Title VII of the Civil Rights Act of 1964, as amended.

(*Id.* at 1.) Williams later amended the Charge to reflect a low rating she received in a performance review from Newbern in February 2019. (*Id.* at 2.) Williams remains employed at MLGW as a Clerk III and is no longer supervised by Newbern or Page. (ECF No. 47-1, 20.)

2. *Plaintiff's Additional Facts*

Williams provided a Statement of Additional Material Facts in response to the motion that are supported almost entirely by her own testimony. This Statement consists of thirty-six separate paragraphs and runs seven-and-a-half pages long. Local Rule 56.1(b) limits such Statements to five pages without prior Court approval and requires that "each such disputed fact shall be set forth in a separate, numbered paragraph with specific citations to the record supporting the condition that such fact is in dispute." Almost all of Williams's paragraphs provide multiple facts. MLGW requests in their response to these facts that the Court strike the entire Statement due to these violations of the Local Rules. The Court does not believe such a harsh sanction is required but will disregard Additional Facts 30-36 for exceeding the page limit. However, Williams should note that this matter is entirely within the Court's discretion, and its decision is predicated fully on MLGW's ability (through extra and unnecessary effort) to provide responses to each fact, even where mixed into one paragraph.

Williams' additional facts relate practices she alleges she was subjected to under Newbern that male employees did not face. Williams does not provide any evidence that these allegations were ever reported to MLGW and they were never listed in her internal or external charges of discrimination or subsequent amendments. She also does not provide a date as to when this behavior began. According to Williams, Newbern had issues with how often she used the bathroom - unlike male employees - and even attempted to set up a meeting with union representative Roy Johnson about the issue. (ECF No. 59, 5.) She was eventually limited to one bathroom break per day. (*Id.* at 6.) Williams also alleges many office rules were applied inequitably. Male employees were allowed to loudly use their cell phones, but she was scolded for doing so. (*Id.* at 5.) She was forced to take her lunch at 11:00 a.m. every day, while male employees could go to lunch anytime they desired. (*Id.* at 7.) Her break was allegedly limited to

30 minutes, while men received 45 minutes. (*Id.*) Newbern denied her the right to drive company vehicles (when is unclear, as she previously stated she drove a company vehicle to the Netters location) while all men were allowed to use them. (*Id.* at 8.) In terms of discreet acts, Williams alleges that Newbern denied her request to be the United Way representative, even though it was "customary" for clerks such as her to take the position, and instead installed an unspecified male friend. (ECF No. 59, 9.) Along with this social ostracization, Williams was excluded from monthly safety meetings. (*Id.* at 11.) Williams alleges that Newbern took office keys away from her and gave them to a male employee, which prevented her from being able to access necessary supplies. (*Id.* at 13.) The only other acute incident relayed in the additional facts involves a retirement party for an unnamed male coworker.[2] Williams alleges Newbern organized the party and brought food for the celebration but denied her the chance to eat any even though she had contributed monetarily. (*Id.* at 10.) Williams also provided additional detail about the "badmouthing" she alleged in her deposition. She states Newbern spoke poorly about her to others in the department, talk which caused an employee named Mark Love to call her a "bitch." (*Id.* at 9 – 10.) She recalls Newbern referring to another female employee, identified only as "Rosalyn," as a "bitch" as well (*Id.* at 12.)

## II.   **LEGAL STANDARD**

### 1. *Motion to Strike*

MLGW offers multiple tests under which they believe Williams and Johnson's affidavits should be stricken. First, they cite to a long standing rule that "a party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony." *Johnson v. Ford Motor Co.*, 13 F.4th 493, 501 (6th

---

[2] In her later, challenged declaration, Williams identifies this coworker as Walter Johnson. (ECF No. 53-14, 5.)

Cir. 2021). This rule, often called the "sham affidavit rule," prevents a party from creating a genuine dispute of material fact at summary judgment by submitting an affidavit that conflicts with the same party's earlier testimony about the same fact. *France v. Lucas*, 836 F.3d 612, 622-24 (6th Cir. 2016). Applying the rule involves a two-step analysis. The court "must first determine whether the affidavit directly contradicts the nonmoving party's prior sworn testimony." *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006). The definition of "contradiction" is "relatively narrow." *Reich v. City of Elizabethtown, Kentucky*, 945 F.3d 968, 976 (6th Cir. 2019). If there is no "direct contradiction," the rule "can also apply when the witness's affidavit is in tension with that prior testimony as long as the circumstances show that the party filed the affidavit merely to manufacture a 'sham fact issue.'" *Boykin v. Family Dollar Stores of Mich., LLC*, 3 F.4th 832, 842 (6th Cir. 2021) (citing *Aerel*, F.3d at 908). The Sixth Circuit has previously listed factors for courts to consider when deciding whether an affidavit was filed to manufacture a sham fact issue, including "whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion the affidavit attempts to explain." *Aerel*, 448 F.3d at 908-09 (citing *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986)). However, nothing prevents a party from "simply 'fill[ing] a gap left open by the moving party[']'" where the party "was not directly questioned about an issue." *Reich*, 945 F.3d at 976 (quoting *Aerel*, 448 F.3d at 907).

Second, MLGW cites Federal Rule of Civil Procedure 56(c)(4). The Rule states that "an affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Statements made "on belief or 'on information and

belief' cannot be utilized on a summary-judgment motion." *Ondo v. City of Cleveland*, 795 F.3d 597, 605 (6th Cir. 2015). Much of MLGW's brief focuses on the admissibility of facts under this Rule, specifically regarding alleged hearsay and opinions contained in the declarations. "Rule 56 requires the plaintiff to present evidence of evidentiary quality that demonstrates the existence of a genuine issue of material fact . . . [t]he proffered evidence need not be in admissible *form*, but its *content* must be admissible." *Tranter v. Orick*, 460 F.App'x 513, 515 (6th Cir. 2012) (quoting *Bailey v. Floyd Cnty. Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997)). Thus, "[i]t is well established that a court may not consider hearsay when deciding a summary judgment motion." *Id.* at 514 (citing *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007); *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 927 (6th Cir. 1999)). "Affidavits composed of hearsay and non-expert opinion evidence" should be disregarded under the rule. *Wright v. Baker*, 849 F. Supp. 569, 572 (N.D. Ohio 1994). Once a party has objected that "the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence," the party offering the fact must "show that the material is admissible as presented or . . . explain the admissible form that is anticipated." *Thomas v. Haslam*, 303 F.Supp.3d 585, 624 (M.D. Tenn. 2018) (quoting *Magnum v. Repp*, 674 F. App'x 531, 536-37 (6th Cir. 2017)).

   2.   *Motion for Summary Judgment*

   Summary Judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists when, viewing the evidence in the light most favorable to the non-moving party and construing all inferences in their favor, there is sufficient evidence for a trier of fact to find for the non-movant. *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006). The movant may properly support a motion for summary judgment by relying on the record

and any supporting affidavits to show a lack of "genuine dispute[s], or that an adverse party cannot produce admissible evidence to support [a] fact." Fed. R. Civ. P. 56(c)(1)(B); *see also Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1478 (6th Cir. 1989).

Conversely, a genuine dispute of a material fact will allow the non-movant to survive summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The non-movant cannot rely solely on the pleadings in opposing the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The evidence must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-movant, as the party with the burden of proof at trial, must support claims with concrete and corporeal evidence. *See Cloverdale Equip. Co. v. Simon Aerials, Inc.*, 869 F.2d 934, 937 (6th Cir. 1989). The district court does not have the duty to search the record for such evidence. *See* Fed. R. Civ. P. 56(c)(3); *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). Additionally, "a nonmoving party may not avoid a properly supported motion for summary judgment by simply arguing that it relies solely or in part upon credibility considerations or subjective evidence." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995). If the evidence presented cannot "reasonably support a jury verdict in favor of the nonmoving party, the motion for summary judgment will be granted." *Id.*

### III.      <u>LEGAL ANALYSIS</u>

*1. <u>Motions to Strike</u>*

Before the Court considers the merits of MLGW's Motion for Summary Judgment, it must determine which evidence may be used to support or defend that motion. MLGW has filed Motions to Strike two declarations that Williams attached to her Response to the Motion for

Summary Judgment and uses to support her contention that there are triable issues of material fact. The Court will consider each declaration in turn.

      a.   *Jacqueline Williams*

MLGW moves to strike the declaration of Jacqueline Williams, making the argument that all but two of its fifteen paragraphs either attempt to create a sham fact, are not based on personal knowledge, or contain inadmissible hearsay. (ECF No. 60.)

      i.   *Paragraphs 2-4*

First, MLGW argues that Paragraphs 2-4 attempt to create a sham fact. In these paragraphs, Williams describes the October 2014 written reprimand issued by her former manager Chris Rutledge for not assisting with entering timecards while another clerk was on vacation. (ECF No. 53-14, 1 – 2.) MLGW focuses on Paragraph 3's allegation that Rutledge would not let Williams work overtime to enter the time while letting other employees work overtime, which was not related in her deposition testimony. (ECF No. 60, 3.) Williams argues that while she did not repeat this claim in her deposition testimony, it does not contradict any of her testimony and was contained in a "Responses to MLGW Position Statement" she attached to her complaint. (ECF No. 66, 2.)

The Court agrees with Williams. While Williams did not directly repeat the overtime claim in her deposition, the claim does not directly contradict any of her testimony. MLGW never directly questioned Williams about whether she was denied overtime to complete the time entry and did not address the time entry incident at all beyond asking her to authenticate a record of the reprimand. *See Briggs v. Potter*, 463 F.3d 507, 513 (6th Cir. 2006) (a party is under no obligation to volunteer information where not "expressly asked" about it). Further, MLGW was aware of this claim since it was contained in her original filings. This is a clear example of Williams filling

16

a gap in her testimony. MLGW also makes a brief argument that Williams never establishes a basis for her personal knowledge of when Phillip Lim, the manager of the Department, wanted the time entered by. However, "a court can conclude from the context of the declaration" whether a statement is based on personal knowledge or not. *Ondo*, 795 F.3d at 604 (citing *DIRECTV, Inc. v. Budden*, 420 F.3d 521, 530 (5th Cir. 2005)). The context of the declaration supports that Williams was aware of her job responsibilities – the entire dispute revolves around them – which would include deadlines set by managers. She need not make explicit such a clear implication.

### ii. *Paragraphs 5-8*

MLGW next moves to strike Paragraphs 5-8 of Williams' declaration, which relate to Detrick Smith's harassment claim against her. First, they argue that Paragraphs 5-6 do not establish Williams' personal knowledge of a conversation between Smith and Rutledge and contain inadmissible hearsay by relating that conversation. Williams does not offer an explicit argument in opposition to striking Paragraphs 5-6. If Williams intends for her argument regarding Paragraphs 7-8 to apply to Paragraphs 5-6 as well, the Court notes that this argument is simply that the facts contained in Paragraphs 5-6 were presented to MLGW in Williams' original filings and in her deposition, much like her argument regarding Paragraphs 2-4. Nothing in the declaration directly contradicts her testimony on the matter, as again, MLGW did not question her about the issue in depth. (*See* ECF No. 47-1, 175-79.) Much of the story fills in gaps left by MLGW's questioning. However, hearsay repeated from a previous filing is not admissible. Fed. R. Evid. 801-02. Williams relates details of a conversation between Smith and Rutledge, and between Smith and herself, that are clearly hearsay and makes no argument for either an exception or an alternative admissible form. *See Thomas*, 303 F.Supp.3d at 624. Accordingly, the last six

sentences of Paragraph 5 are struck.[3] Further, the last clause of Paragraph 6 is struck, as it conveys only Williams' opinion as to why Smith filed the harassment complaint against her.

Regarding Paragraphs 7-8, MLGW argues they contain hearsay and statements not based on Williams' personal knowledge. In Paragraph 7, they specifically point to Williams' statement that "According to the Chief Steward (Lawrence Cannon, Retired) he came to the HR Labor Relations Office to represent me and he was told to leave as well" as being not based on Williams' personal knowledge. Williams offers no clear argument in response and thus this statement is stricken. MLGW then argues that Paragraph 8 "is almost entirely composed of hearsay." (ECF No. 60, 6.) In the paragraph, Williams states she attended a grievance hearing regarding her punishment due to Smith's complaint and was given conflicting reports of the punishable behavior by Angela Hewlett and Angelita Settles. (ECF No. 53-14, 4.) Williams' only response regarding this claim is to state that "Ms. Settles was speaking within the scope of her employment as Labor Engagement Specialist" and citing to Federal Rule of Evidence 802(d)(2)(D). (ECF No. 66, 4.) However, the statement conveyed from Ms. Settles is accurately described by MLGW as "hearsay-within-hearsay-within-hearsay." (ECF No. 60, 6) ("According to Ms. Settles during the hearing, Dietrick Smith told Virginia Leonard that someone told him Plaintiff was bullying and harassing him . . .")  While Williams' argument could potentially address one layer, "each part of the combined statements" must conform with an exception to the rule. Fed. R. Evid. 805. Upon

---

[3] MLGW states that "if a paragraph in a Declaration contains an inadmissible statement, the entirety of the paragraph must be struck." (ECF No. 60, 5) (citing *Ondo*, 795 F.3d at 605). *Ondo* does not say this. Instead, it states that "when an affidavit is partially admissible and partially inadmissible, the district court must reject only those parts that are inadmissible." *Ondo*, 795 F.3d at 604 (citing *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 593 (6th Cir. 2009)). Unless "parts" is read as synonymous with paragraphs, MLGW's argument goes too far. *Ondo* merely notes that "the district court has discretion to determine whether it can differentiate between knowledge and belief for each averment in the affidavit" and should strike those parts that rely solely on belief where the Court can differentiate. *Id.* at 605. If the Court cannot differentiate, then it must strike an affidavit in full. *Id.* "In resolving a motion to strike, the Court should use a scalpel, not a butcher knife," and the Court will do so here as well. *Giles v. Univ. of Toledo*, 241 F.R.D. 466, 469 (N.D. Ohio 2007).

review, almost all of Paragraph 8 is composed either of hearsay or makes it difficult to determine what is based on Williams' personal knowledge. (ECF No. 53-14, 3 - 4) ("**There was** a third step recorded grievance hearing held with Angelita Settles . . . **The union** received a response back from Angela Hewitt . . '") (emphasis added). Accordingly, the entirety of Paragraph 8 is struck.

### iii.   Paragraphs 9-14

Regarding Paragraphs 9-14, MLGW argues generally that Williams mixes inadmissible hearsay and statements not based on her personal knowledge. In Paragraph 9, they argue Williams' claim that Michael Page paid another female employee $10 to complete performance evaluations is speculation otherwise not supported by Williams' personal knowledge. (ECF No. 60, 6 – 7.) Williams counters that this claim was presented previously in Exhibit 28 to her deposition and that she has personal knowledge because Page offered her $10 to complete the evaluations as well. (ECF No. 66, 5.) However, a review of the claim's source shows this is an entirely new claim. Williams has previously said "Mr. Page stated to me that he would offer money to [the other employee]" and that she herself was offered money, but never that another employee was actually paid. (ECF No. 66-2, 9.) Being offered money is not personal knowledge that another was offered money. This new fact is not supported by any previous records and suggests speculation on Williams' part. Accordingly, it is struck.

MLGW seeks to strike the second sentence of Paragraph 10, which states in full: "Mr. Page was attempting to memorialize in writing directions to tasks I was performing and wording said emails in a manner to make it look like I was not in fact performing said tasks." (ECF No. 53-14, 4.) They argue this is merely Williams' opinion and that her knowledge of Page's intentions is not supported by any admissible fact. (ECF No. 60, 7.) Williams protests that she has personal knowledge from reading the emails and can testify as to her experience. The email

in question was not provided to the Court and Williams' bald statement of Page's motive is speculation not based on personal knowledge.[4] In contrast, the first sentence of this paragraph, wherein Williams states Page directed her to perform tasks she had already completed, is based directly on her personal experience and leaves no room for speculation. Thus, the second sentence of Paragraph 10 is struck.

Paragraph 11 states "[t]he male employees who Mr. Newbern supervised and treated better than the women, and better than me are Fred Motley, Mark Love (retired), Ulysses Kirk Lewis, Daniel Small, Danny Hickman, Walter Johnson (retired)." MLGW argues that this is mere inference and opinion, that Williams never identified how these men were treated better, and that Williams never named Thurmond, Small or Motley in her deposition. (ECF No. 60, 7.) Williams claims her deposition detailed the ways she was treated worse than male coworkers supervised by Newbern and that she is now identifying those "male coworkers" from the deposition. (ECF No. 66, 6.) The Court agrees with Williams. It is clear from context that Williams is providing names of the men who benefited from the general practices she alleged in her deposition. MLGW never asked Williams to identify these coworkers during their questioning on the subject. (ECF No. 47-1, 82-95.) Williams is merely filling gaps in her testimony by providing names now. MLGW protests that those provided are not similarly situated comparators, but that is a question of law regarding summary judgment and irrelevant to a Motion to Strike. Paragraph 11 will be preserved.

---

[4] Williams notes that statements of intent or motive are allowed as exceptions to hearsay under Fed. R. Evid. 803 but Paragraph 10 contains no "statements" as defined under Rule 801 and MLGW did not raise a hearsay argument. (ECF No. 66, 5.)

Paragraph 12[5] states in full: "Mr. Love and Mr. Lewis are personal friends of Mr. Newbern. I have seen pictures of them together outside of work on Facebook." MLGW argues this is a statement of opinion and inference, (ECF No. 60, 7), while Williams merely states that she also identified Love as Newbern's friend in her deposition, (ECF No. 66, 7). The Court notes that Williams failed to include anything to show how she knew about Newbern's friendship with Love and Lewis. Williams' description of an unspecific Facebook post is of little relevance to the litigation. The rest constitutes speculation by Williams. Accordingly, the paragraph is struck.

Paragraph 13 states: "Willie Thurmond was allowed to drive the vehicle while on light duty. I was not allowed to drive the vehicle after Mr. Newbern took the keys from me." (ECF No. 53-14, 5.) MLGW argues this paragraph contradicts Williams' testimony, wherein she did not mention having the vehicle keys taken by Newbern. (ECF No. 60, 8.) Williams says she did state in her deposition that Newbern did not allow her to drive the company vehicle – while male employees could - and that this statement explains the testimony. (ECF No. 66, 8.) These two statements do not contradict each other. Williams explains that the way she was kept from driving the vehicle was by Newbern taking the keys. The paragraph will be preserved.

Finally, Paragraph 14 relates a story Williams told in her deposition, wherein her supply room keys were taken by Newbern and given to a male employee named Sam Tinsley. (ECF No. 53-14, 5.) In the declaration, Williams adds that this was done after she filed complaints against Newbern. MLGW argues she did not specify the timing of this during her deposition and seeks to create a sham fact. Williams counters by stating she seeks to fill in gaps in her testimony and points to a filing wherein the timing of the event was specified as November 5, 2018, after she filed complaints against Newbern. (ECF No. 66, 8.) The Court agrees with Williams. The timing

---

[5] Williams' declaration contains two Paragraph 12s, the second of which the Court will refer to as Paragraph 12.1. (ECF No. 53-14, 5.) MLGW advances no specific argument regarding Paragraph 12.1. Accordingly, it is preserved.

of the event was available to MLGW and was not questioned about during Williams' deposition. (ECF No. 53-1, 95.) This paragraph seeks to fill a gap. It will be preserved.

In sum, MLGW's Motion to Strike is **GRANTED IN PART** and **DENIED IN PART**. The last six sentences of Paragraph 5, the last clause of Paragraph 6, Paragraph 7's statement regarding Lawrence Cannon, the entirety of Paragraph 8, the statement regarding another female clerk's payment in Paragraph 9, the second sentence of Paragraph 10, and the entirety of Paragraph 12 are struck from the declaration.

   b. _Roy Johnson_

MLGW filed a separate motion to strike the declaration of Roy Johnson, a Union Steward who asserts he has helped Williams file multiple grievances against Newbern. (ECF No. 61.) Generally, MLGW asserts Paragraphs 3-18 of Johnson's declaration fail to follow Rule 56(c)(4) and contain inadmissible statements of either belief or hearsay. (_Id._ at 3.) Williams' brief is not entirely responsive and mostly restates Johnson's declaration. Where a specific argument is advanced, the Court will note and consider it.

In Paragraph 3, Johnson states he has known Williams for ten years and believes her to be honest, trustworthy, and good at her job despite not being close personal friends with her. (ECF No. 53-16, 1.) MLGW states these are mere statements of opinion with no factual basis. (ECF No. 61, 3.) Williams does not specifically respond to this argument. The paragraph mixes Johnson's belief and character opinions which are inadmissible and not allowed in their present form. Accordingly, it is struck.

In Paragraph 4, Johnson states the following: "I believe Jackie's statements about how Keith Newbern treated her, because I personally saw Mr. Newbern raise his voice and be hostile towards her throughout the time she worked for him, and she is a trustworthy person whereas he

is an angry, abusive, hostile person." (ECF No. 53-16, 2.) MLGW argues this is an "impermissible melting pot of fact, personal belief, speculation and unsupported opinion." (ECF No. 61, 4.) The Court agrees. While Johnson does approach providing a fact by stating that he has seen Newbern be hostile to Williams, he provides no supporting details or context for his accusation. The paragraph is one sentence which mixes Johnson's inadmissible opinion of Newbern's character with his belief about one of the ultimate questions of the case. Fed. R. Evid. 404. The paragraph is struck.

Paragraph 5 states Johnson evaluated every grievance he helped her file against Newbern and that he believes management should have taken action against Newbern. (ECF No. 53-16, 2.) This again mixes Johnson's opinion with a fact in a single sentence in a way that cannot be untangled. Accordingly, it is struck.

Paragraph 6 states "Keith has a reputation of lying about people, attacking them, and generally being hostile and abusive. It was common knowledge in all of the departments that he treats women badly." (ECF No. 53-16, 2.) MLGW argues there is no factual basis for his beliefs. The Court agrees. The Paragraph consists entirely of unsubstantiated general opinion about Newbern's reputation and amounts to impermissible character evidence. Fed R. Evid. 404, 602. The paragraph is struck.

Paragraph 7 states Johnson once helped another woman, Jacqueline Mack, file a grievance against Newbern for being hostile and mistreating her. (ECF No. 53-16, 2.) MLGW argues it is unclear if Mack is the woman Johnson assisted and that the statement is without sufficient probative value. Williams does not address this argument in her brief, but the Court does not agree. This statement is clearly within Johnson's personal knowledge and conveys a straightforward fact. The sentence is clear that Johnson is describing assisting Mack. (ECF No.

53-16, 2) ("I helped another women [sic] file grievances against Keith for being hostile to her and mistreating her, for example Jacqueline Mack, who was the only other woman in the department.") The paragraph will be considered.

In Paragraph 8 Johnson says "upper management" knew Newbern acted abusively towards women and provides that a "friend of mine who's a VP level director" asked him about Newbern's behavior. (ECF No. 53-16, 6.) MLGW argues that the first sentence fails to establish Johnson's personal knowledge of what "upper management" knew and that the second sentence is inadmissible hearsay. Williams makes a general objection near the end of her brief that opposing party statements, including those made by employees of an opposing party company, are exceptions to the rule against hearsay where the statement was made within the scope of the employee relationship. (ECF No. 67, 3.) However, in order to establish reliability, at a minimum, there must be evidence of who was making the inquiry, that an employment relationship existed and that the matter spoken about was within the scope of that relationship. *Back v. Nestle USA, Inc.*, 694 F.3d 571, 578 (6th Cir. 2012) (citing Fed. R. Evid. 802(d)(2)). Here, neither Johnson nor Williams provides any factual basis or other corroborating evidence to show the existence or nature of the relationship. The "VP level director" is not named, nor is there any information presented that would put the relationship in context relative to the encounter. It is unclear if the VP had supervisory authority over Newbern or whether Newbern's behavior was within the scope of their employment. Williams offers no argument regarding how this statement could be admissible. Accordingly, the statement is struck.

MLGW argues that Paragraph 10[6] fails to establish a foundation for Johnson knowing Newbern would get upset when Williams would use the bathroom. (ECF No. 61, 6.) However,

---

[6] Johnson's declaration does not contain a Paragraph 9.

much of this paragraph is clearly based on Johnson's personal knowledge. Also, where recounting what Newbern told Johnson, such statements are admissible as opposing party statements due in large part to Newbern's employment with MLGW. The statement will be preserved.

Paragraph 11 relates that Johnson helped Williams file 15 grievances against Newbern and states Williams told Johnson that Newbern would excessively monitor her bathroom usage, which greatly upset her. (ECF No 54-16, 2 – 3.) MLGW argues there is no factual basis for how Johnson knew people did not talk to Williams because of Newbern's behavior. Thus, in their view, the paragraph relates inadmissible hearsay. However, from context, Johnson establishes that he was told some of these things by Williams and the statement is otherwise based on his personal knowledge. The Court will consider the paragraph except for its last sentence, which is simply too vague to be of value.

In Paragraph 12, Johnson relates his experiences of July 11, 2018, when Williams called the police to the office. (ECF No. 53-16, 3.) MLGW argues the second sentence, which describes what Johnson heard the police say, is inadmissible hearsay and that the third sentence is mere speculation and opinion. (ECF No. 61, 7.) The Court agrees but finds that the first sentence will likely be reduced to an admissible form, given that it relates Johnson's experience on that day and what Williams told him had happened. Accordingly, the last two sentences of Paragraph 12 are struck.

Paragraph 13 states Johnson talked with the "compensation department" about a "phony job description" Newbern assigned Williams. (ECF No. 53-16, 3.) MLGW argues this statement amounts to inadmissible hearsay and conveys belief and opinion. (ECF No. 61, 8.) Williams states Johnson is merely relaying what the department told him but offers no argument for reducing this clear hearsay to an admissible form. While "the compensation department" can perhaps be

assumed to be in an employment relationship with MLGW, Johnson again fails to name who he spoke with and whether the job descriptions would fall within the scope of their employment. The Court cannot presume what Johnson did not provide. The paragraph must be struck.

With Paragraph 14, Johnson relates his involvement with the August 30, 2018, meeting regarding Williams' suspension. (ECF No. 53-16, 3.) MLGW argues this is inadmissible hearsay, but the Court anticipates most of Johnson's testimony here would be admissible in some form as opposing party statements given the employment relationship of all involved. The same is true of Paragraph 15, which relates a meeting between Newbern, Williams, Johnson, Sam Tinsely, and Curtis Washington regarding Williams' discipline, all of whom are employed by the company. These paragraphs will be sustained.

Paragraph 16 states in full: "In 2018, I heard another employee call Jackie 'bitch' in conversation with Keith. I told Jackie about it." (ECF No. 53-16, 3.) MLGW argues this fact is inadmissible hearsay. Williams again argues for the opposing party statement exception. Also, it appears the statement would not be offered for the truth of the matter asserted. However, Johnson's failure to identify the employee, provide any date, context, or evidence of the employment status, and whether or not the statement was within the scope of employment make this fact inadmissible. Thus, it must be struck.

Paragraph 17 suffers from similar problems. Johnson states he has "had many conversations with MLGW employees who are members of Keith's family where they have told me that he abuses his wife and other female members of his family" before describing an incident of abuse he claims he was told about. (ECF No. 53-16, 4.)  It seems these statements are meant to establish that Newbern abuses women generally and thus was motivated to abuse Williams. Williams says these statements "are not being offered to prove whether Newbern did those acts

but go to Newbern's motive or intent as to the discriminatory and/or retaliatory treatment of Plaintiff." (ECF No. 67, 3.)   Williams contends the statements constitute opposing party admissions; however, Johnson's failure to name the employees (who apparently are also Newbern's family members) and the likelihood these statements would be outside the scope of their employment make it unlikely that they would be admissible. The statements and opinions are clearly irrelevant and highly prejudicial. In addition, Williams has failed to establish any foundation that would support admission of these statements. Fed. R. Evid. 602.  Thus, Williams' argument is not well-taken, and the paragraph must be struck.

Finally, Paragraph 18 states: "It is true that I never personally saw Michael Page raise his voice towards Jackie. But I did see Keith raise his voice and do hostile gestures towards Jackie, plenty of times." (ECF No. 53-16, 4.) MLGW only challenges the second sentence, which they state does not provide enough details to establish Johnson's personal knowledge. The Court disagrees. It is clear Johnson is stating he has personally seen or heard Newbern make hostile gestures towards Williams. This paragraph will be maintained.

Accordingly, MLGW's Motion is **GRANTED IN PART** and **DENIED IN PART**. The following portions of Johnson's declaration are hereby struck: Paragraphs 3, 4, 5, 6, 8, the last sentence of Paragraph 11, the last two sentences of Paragraph 12, and Paragraphs 13, 16, and 17.

*2. Motion for Summary Judgment*

With the world of considerable evidence defined, the Court now turns to considering MLGW's Motion for Summary Judgment. They seek Summary Judgment on all claims. Williams has asserted four related claims under Title VII: (1) sex discrimination through disparate treatment, (2) hostile work environment based on sexual harassment, (3) retaliation, and (4)

retaliatory harassment. The Court will consider the sex-discrimination-based claims before turning to the retaliation-based claims.

a. _Sex Discrimination – Disparate Treatment_

It is illegal to terminate or otherwise materially adversely impact an employee based on their race, color, sex, sexual orientation, gender identity, religion, or national origin under Title VII. *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1734 (2020). "A plaintiff can fend off a motion for summary judgment on a Title VII claim using either direct or circumstantial evidence of discrimination." *Shazor v. Professional Transit Management, Ltd.*, 744 F.3d 948, 955 (6th Cir. 2014). Williams argues only from circumstantial evidence for her sex discrimination claim. (ECF No. 53, 1 – 2.) When arguing from circumstantial evidence, a plaintiff must first make out a *prima facie* case of discrimination. This is a four-step process, whereby a plaintiff must show that "(1) [she] is a member of a protected group; (2) [she] was subjected to an adverse employment decision; (3) [she] was qualified for the position; and (4) similarly situated non-protected employees," often called comparators, "were treated more favorably." *Smith v. City of Toledo, Ohio*, 13 F.4th 508, 515 (6th Cir. 2021) (quoting *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 776 (6th Cir. 2016)). An employee "need not be identical in every way in order to be a proper comparator." *Tennial v. United Parcel Service, Inc.*, 840 F.3d 292, 304 (6th Cir. 2016). Instead, courts are to "make an 'independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the nonprotected employee.'" *Id.* (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)). The burden is on the plaintiff, who "must show that the comparator is similarly situated in all relevant aspects and has engaged in acts of comparable seriousness." *Id.* (citing *Bobo v. United Parcel Service, Inc.*, 665 F.3d 741, 751 (6th Cir. 2012)). If the Plaintiff makes a *prima facie* case, "the

burden shifts to the defendant to proffer a legitimate, non-discriminatory reason for the employment decision at issue." *White v. Columbus Metropolitan Housing Auth.*, 429 F.3d 232, 238 (6th Cir. 2005) (citing *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 463 (6th Cir. 2003)). If the defendant articulates such a reason, the burden then shifts back to the plaintiff to show that "the reason the employer gave was not its true reason, but merely a pretext for discrimination." *Smith*, 13 F.4th at 515 (internal quotation marks omitted).

MLGW argues Williams cannot establish a *prima facie* case because she has not pointed to any similarly situated, non-protected employees who were treated better than her. (ECF No. 47, 11.) They state Williams' EEOC Charge and Amended Complaint identify only Nakia Rutherford as a comparator who was treated more favorably, namely in not being disciplined despite lying. MLGW argues that Rutherford and Williams' false statements differ significantly. On the one hand, Rutherford's false statement concerned a minor incident – use of a company vehicle to go to lunch while he was on light duty – while on the other hand, Williams was disciplined for giving false statements in the investigation of her claims against her supervisor. (*Id.* at 12.) Williams disagrees, stating that her claim is not based solely on Rutherford and "is based in the fact that every male employee under Mr. Newbern was treated differently and more favorably." (ECF No. 53, 2.) As evidence for this, Williams cites exclusively to her deposition testimony that formed the basis for her additional material facts described above.

This is a global problem with Williams' argument. Simply put, almost all allegations of discrimination, including alleged comparators besides Nakia Rutherford, are based solely on her unsupported conclusory deposition testimony. At no point in her argument does Williams cite to any evidence other than her own testimony.[7] (*see* ECF No. 53, 3 – 5.) This is insufficient at the

---

[7] Williams cites to Newbern's deposition twice when describing an unspecified complaint filed against him by another employee named Jacqueline Mack. (ECF No. 53, 3.)

Summary Judgment stage. *Arendale v. City of Memphis*, 519 F.3d 587, 605 (6th Cir. 2008) ("Accompanying none of these allegations, however, is actual evidence of racial animus. Rather, Plaintiff supports each allegation only with a citation to his own testimony stating his personal opinion that he was the victim of racial harassment."); *see also Ashbrook v. Block*, 917 F.2d 918, 921 (6th Cir. 1990) ("Although the nonmoving party's evidence in opposition to summary judgment need not be the sort admissible at trial, he must employ proof other than his own pleadings and own affidavits to establish the existence of specific triable facts.") (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

Even accepting Williams' alleged extra comparators, she only provides a list of names and a list of general accusations of differential treatment in applying office standards. (ECF No. 53-14, 4) ("The male employees who Mr. Newbern supervised and treated better than the women, and better than me are Fred Motley, Mark Love (retired), Ulysses Kirk Lewis, Daniel Small, Danny Hickman, Walter Johnson (retired)"). Williams provides no information or details on these men beyond their names. Thus, the Court cannot evaluate whether they are similarly situated employees when considering the ways Williams alleges she was treated differently.[8] The Court is unaware of these men's job titles and responsibilities, work schedules, or disciplinary history. Williams claims "some" male technical workers "who were injured would be on light duty in the office fulfilling many of the same job duties as Ms. Williams," but provides no support for this claim. She does not even specify which male technical workers she refers to. (ECF No. 53, 3.) Without more, Williams cannot establish a genuine dispute regarding whether these men were

---

[8] As described above, Williams alleges that she was given fewer bathroom breaks than male employees, could not talk on her cell phone as male employees could, was forced to take a regimented lunch unlike male employees, could not drive the company vehicles like male employees, and once was barred from eating at a retirement party. (ECF No. 53, 2 - 4.) Williams' brief does not directly tie these allegations into any part of the *prima facie* case argument other than for identifying comparators.

truly similarly situated or were treated differently than her at the company. Thus, Williams has not established a *prima facie* case.

Even if the Court were to assume that Williams has adequately identified similarly situated comparators, and the disparate treatment she suffered in comparison to them, the burden would then shift to MLGW to articulate a legitimate non-discriminatory reason for her suspension. They have done so. MLGW has presented evidence that Williams was suspended for lying during the investigation into her internal charge of discrimination and for misrepresenting the events of July 11, 2018. (ECF No. 47, 13.) Based upon the record, the Court finds that MLGW's has advanced a legitimate and non-discriminatory reason for suspending Williams.

The burden then becomes Williams' again, to demonstrate by a preponderance of the evidence that this reason was pretext through showing either that "the employer's proffered reason for the adverse action (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Jackson*, 814 F.3d at 779 (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)). Ultimately, a plaintiff must convince the court that they have been the victim of intentional discrimination. *Id.* (citing *Burdine*, 450 U.S. 248, 256 (1981)). Despite doing so in previous filings, Williams' brief on this issue does not point to Nakia Rutherford's as a potential comparator, but instead uses his treatment as a fact supporting her contention that MLGW's stated reason for her suspension was pretextual. (ECF No. 53, 7.) Without adequately identifying a comparator, Williams' pretext argument is premature.

In her deposition and complaint, Williams argued that Rutherford was not disciplined despite his admission to lying during the investigation, while Williams was disciplined for lying during the investigation. This, she argued, demonstrates MLGW's clear discrimination based on

sex. (ECF No. 23, 8.) To give a full hearing to the arguments, the Court will consider this pretext argument as presented, as well as a later pretext argument, and consider whether Rutherford could serve as an adequate comparator at step four of the *prima facie* case analysis.

### i. *Pretext – Insufficient Motivation*

Williams has previously argued that Rutherford, a man, was treated better than her for identical behavior in that she was suspended for lying in the investigation surrounding her internal charge, while Rutherford also lied but was not suspended. She argues this demonstrates MLGW's stated reason for suspending her (i.e. lying during the investigation of her discrimination charge) is pretext. She contends that a plaintiff can show an employer's reason was insufficient to motivate the challenged conduct by "provid[ing] evidence that 'employees outside the protected class were not disciplined even though they engaged in substantially identical conduct to that which the employer contends motivated its discipline of the plaintiff.'" *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 328 (6th Cir. 2021) (quoting *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 893 (6th Cir. 2020)). MLGW disputes that Rutherford can serve as a similarly situated employee or that his treatment demonstrates pretext when compared to Williams. Specifically, all parties agree that Rutherford lied in claiming that he did not take a company vehicle to a personal lunch with Williams when he in fact had. (ECF No. 54, 16.) MLGW argues that Rutherford's lie was minor in comparison to Williams' and was not related to the actual investigation. On the other hand, Williams was found to have lied about the accusations that, in large part, led to the wider investigation, namely the circumstances leading up to and surrounding the July 11, 2018 incident. (ECF No. 47, 12.) Although MLGW concedes that both of the false statements amount to violations of company policy, they also aver that Williams' statement was different because it was far more serious and severe. (ECF No. 47-19.) MLGW points to another significant factor:

Rutherford and Williams had different disciplinary histories. Rutherford had no prior disciplinary record while Williams had been previously reprimanded and suspended on prior occasions. (*Id.*) This fact prevents them from being considered similarly situated.

The Court agrees with MLGW. The undisputed material facts demonstrate that Williams and Rutherford were both found to have given false statements about vehicle use in the investigation. But Williams was found to have also provided a false account of the facts surrounding the July 11, 2018 incident. (ECF No. 47, 12.) The investigation determined Williams violated additional company policies above lying about the company vehicle. (*Id.*) Simply put, Williams and Rutherford engaged in different behavior and carried different disciplinary baggage. Williams had been previously suspended due to previous conflicts with coworkers while Rutherford had no disciplinary history at all. Indeed, she was found to have violated the same Labor Relations Bulletin (#104) here as when she was disciplined after Phillip Miller and Dietrick Smith's allegations against her. *Compare* (ECF No. 47-3, 3) *with* (ECF No. 47-19). At the time, she was warned that "the Division will not tolerate any future behavior that is in violation of the above referenced Bulletins." (ECF No. 47-7, 2 – 3.) The Sixth Circuit has previously held that courts should consider whether the employee designated in support of a pretext argument dealt with the same supervisor, was subject to the same standards, and "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Ercegovich*, 154 F.3d at 352. Of note, Williams does not state or argue that Rutherford was ever supervised by Newbern.

Williams has not demonstrated a genuine dispute around the material fact that Rutherford and she were found to have engaged in different behavior and had different disciplinary track records. On the record, no reasonable trier of fact could find that Rutherford was a similarly

situated comparator, nor that he engaged in substantially identical conduct to Williams. Williams

is thus unable to make a *prima facie* case for sex discrimination, and unable to show that MLGW's

legitimately offered reason for her suspension was pretextual through Rutherford's treatment.

ii. *Pretext – No Basis in Fact*

Williams also takes issue with MLGW's proffered reason for her termination by

recounting her version of the events of July 11, 2018.[9]  She argues that MLGW's stated reason

for suspending her (that she presented a false version of the events of July 11, 2018 during the

investigation and about her treatment by Newbern) had no basis in fact, because their conclusions

regarding the events of that day and her discrimination generally are false. As evidence for this,

she recounts her own testimony regarding the day and provides a recounting of the alleged

disparate treatment she faced. (ECF No. 53, 8 – 9.) Again, a plaintiff must demonstrate that the

offered reason is pretext by a preponderance of the evidence standard. *Abdulnour v. Campbell*

*Soup Supply Co., LLC*, 502 F.3d 496, 502 (6th Cir. 2007).

The preponderance of the evidence does not show that MLGW's offered reason is

pretextual.  In support of her version of events of July 11, 2018, Williams offers only her own

testimony. (S*ee* ECF No. 53, 8 – 9.) However, MLGW's documented investigation included

interviews with multiple witnesses to the events, all of whom supported MLGW's account of the

interaction between Newbern and Williams. (ECF No. 53-4.) These interviews included

Newbern, Quida Moore, a contract employee who witnessed the event, and Marshall Foster,

another employee witness, none of whom claimed that Newbern behaved aggressively or

threateningly towards Williams. (*Id.*) Williams only favorable witness, Nakia Rutherford, did not

witness the events of July 11, 2018. (*Id.*)

---

[9] Williams' brief does not label her arguments, leading the Court to infer from the writing which prong of the pretext
analysis she is contesting.

Regarding the general disparate treatment she alleges, Williams' only witness is again Rutherford, who claims Newbern once told him not to talk to Williams because she "files charges on people." (*Id.*) Newbern claimed to not remember this conversation in his deposition.  A contemporaneous interview backs up that it occurred, but at that time, Newbern characterized it slightly differently. (*Id.*) However, MLGW discounted Rutherford's version of the interaction due to his misrepresentation about taking a company vehicle to lunch. Beyond this one interaction, Williams offers no supporting evidence of sex-based discrimination. No evidence exists to support Williams' allegations about fewer bathroom breaks, regimented and unequal lunches and breaks, and social exclusion except for her own testimony.[10] Even in her own contemporaneous reports about Newbern and Page, Williams does not communicate these stories and has not produced evidence that she ever reported this alleged behavior to MLGW despite amending her charges multiple times. Her internal charge of discrimination listed only the conversation with Rutherford as discriminatory conduct. (ECF No. 47-14.) Her initial report to Paula Mitchell mentions the conversation with Rutherford, "dirty looks", and that Newbern and Page "sp[oke] negatively" about her but describes none of the additional behavior alleged in her testimony. (ECF No. 47-12, 5.) She further notes in this initial report that the reason for the harassment is because she does not feel "comfortable doing their supervisor job duties," rather than her sex. She also alleges, without support, that they have "created a hostile work environment in the department with the employees," who she said were all male except one. (*Id.*) Subsequent interviews with others in the office did not back up Williams' allegations on these matters. (ECF No. 53-4.) Multiple declarations from other employees involved in these matters support MLGW's account as well. (ECF Nos. 47-15, 47-16, 47-17, 47-18.) On this record, it appears that MLGW reasonably

---

[10] Roy Johnson's declaration supports that Newbern took issue with how often Williams took bathroom breaks but not that he limited how many times she could go. (ECF No. 53-14, 2.)

concluded that Williams had misrepresented both the events of July 11, 2018, and her general claims. Williams has failed to show by a preponderance of the evidence that MLGW's conclusions and subsequent suspension had no basis in fact.

### iii.   Pretext – Insufficient Motivation

Williams' citations to the general harassment she alleges solely in her own testimony and declaration raise further issues with her pretext argument. She implicitly raises the idea that her behavior was insufficient to warrant the discipline she faced by citing cases involving this element of the pretext argument. Typically, to make this argument, a plaintiff must show that "other employees, particularly employees not in the protected class, were not fired [or subject to an adverse employment action] even though they engaged in substantially identical conduct to that which the employer contends motivated its [adverse employment action]." *Jackson*, 814 F.3d at 779-80 (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)). Under Title VII, an adverse employment action "is an action by the employer that constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 402 (6th Cir. 2008).

The only adverse employment decision attested to in this record that qualifies under Title VII's definition is Williams' suspension. *See id.* ("In general, a negative performance evaluation does not constitute an adverse employment action unless the evaluation has an adverse impact on an employee's wages or salary.") (quoting *Tuttle v. Metropolitan Gov't of Nashville*, 474 F.3d 307, 322 (6th Cir. 2007)). The differential treatment Williams alleges she suffered in terms of rule application is not an adverse employment decision, but better defined as hostile harassment that fits better within the framework of her hostile work environment claim. The male

36

comparators she identifies in her testimony are not alleged to have engaged in the conduct that motivated Williams' suspension, namely lying during an internal investigation. The only comparator identified that engaged in that behavior is Rutherford. As addressed above, the record is nearly void of evidence for Rutherford to be identified as an adequate comparator, and MLGW has presented evidence that the differences in discipline were "justified by legitimate reasons." *Peltier v. United States*, 388 F.3d 984, 989 (6th Cir. 2004).

In sum, Williams has not identified a similarly situated employee in all relevant aspects for her claim of disparate treatment, and thus has not made a *prima facie* case of sex discrimination. Even if she had, she is unable to demonstrate by a preponderance of the evidence that MLGW's stated, non-discriminatory reason for suspending her was pretextual. Accordingly, MLGW's Motion for Summary Judgment as to this claim is **GRANTED**.

       *b. Sex Discrimination – Hostile Work Environment*

Williams next asserts a hostile work environment claim based on sexual harassment. "In general, to prevail on a hostile work environment claim, a plaintiff must show that (1) he or she was a member of a protected class; (2) he or she was subjected to unwelcome sexual harassment; (3) the harassment complained of was based on sex; (4) the charged sexual harassment created a hostile work environment; and (5) the employer is liable." *Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 307 (6th Cir. 2016) (citing *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006)). "A hostile work environment occurs 'when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Conduct is judged objectively and subjectively, it must be "severe or

pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively perceive the environment as hostile or abusive." *Ault v. Oberlin College*, 620 F. App'x 395, 399 (6th Cir. 2015) (analyzing claim under parallel Ohio state law). While the harassment must be based on sex, this does not mean that the conduct must be "overtly sexual in nature[;]" instead "[a]ny unequal treatment of an employee *that would not occur but for the employee's gender* may, if sufficiently severe or pervasive under the *Harris* standard, constitute a hostile environment in violation of Title VII." *Williams v. General Motors Corp.*, 187 F.3d 553, 565 (6th Cir. 1999). Of course, overtly sexual conduct serves as compelling evidence that harassment is sex-based. *See Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 271 (6th Cir. 2009) ("Here, in contrast, most of the complained of harassment just summarized – both conduct directed at [plaintiff] and indiscriminate conduct – *is* explicitly sexual and patently degrading of women.").

Williams' evidence for a hostile work environment can be divided into two types: corroborated and uncorroborated. The record supports that Williams subjectively perceived a hostile work environment beginning in April 2018, when she emailed Paula Mitchell. At the time, she complained of "dirty looks" and Newbern speaking negatively about her, although left what was said unspecified. (ECF No. 53-5.) She also noted Newbern had approached Rutherford and told him in some fashion that she was "trouble," which Newbern now denies but did support happening in a contemporaneous interview. (*Id.*) At the time, she blamed this treatment on her refusal to complete performance reviews that Newbern and Page wanted her to do. This report eventually led to Williams' temporary voluntary transfer to the Netters location before she later voluntarily returned to Newbern's supervision. (ECF No. 53-7.) After her suspension, Williams also sent an email to Jim West complaining of "constant harassment," although she provided no

specifics. (ECF No. 53-6.) Further, Williams provides evidence that Newbern surveilled her bathroom usage through her own testimony and Roy Johnson's corroboration that Newbern complained to him about it at the time. (ECF No. 53-16.)

But Williams adds additional allegations contained only in her own testimony and declaration. These include differing phone privileges from male employees, excluding her from meetings, denial of supplies and access to company vehicles, and limited and strict lunch times compared to male employees. Further, she states that she once heard Newbern refer to a "Rosalyn," an employee she claims is now retired, as a "bitch" in conversation. (ECF No. 53-1, 78.)

When ruling on a Motion for Summary Judgment, the Court must draw all reasonable inferences in favor of the plaintiff. In a Title VII matter, the hostile work environment harassment must be because of a plaintiff's protected status, in this case sex, and any inferences a court can make in the plaintiff's favor must be reasonable. Here, Williams' most severe allegations of harassment are often contradicted or unsupported by the record and her own prior statements. This prevents the Court from drawing a reasonable inference that the alleged behavior was severe and pervasive enough to constitute a hostile work environment based on sex. Williams is inconsistent about the motivation for harassment in both her testimony and the record, as well as what forms the harassment took. At points she has stated that "all of this animosity towards [her] stemmed from [her] not feeling comfortable" performing certain duties Newbern and Page assigned to her. (ECF No. 53-1, 108.) At other points, she claimed it was because Newbern disliked women generally. (*Id.* at 81.) The Court notes that Williams once stated she believed these duties were assigned to her because she was a woman, but then admits she was the only clerk in the office who could, in essence, help out when others were out of the office. (*Id.* at 109.)

She has stated Newbern was only abusive to her, but also that Newbern spoke to male employees in a similarly confrontational manner. (*Id.* at 108.) He often called both male and female employees "morons." (*Id.* at 107.) In Williams' view, Newbern's actions and words created a hostile environment for "employees" generally in an office she states was overwhelmingly male. She explained that her identification of Newbern's discrimination as sex-based in her original report was because "he took a male employee aside and spoke negative about me, a female" while also alleging that Newbern spoke negatively about male employees as well. (*Id.* at 102.) Williams adds that the harassers referred to her with female pronouns "a lot," which made her "feel I was attacked because I'm a female" and was the "only she." (*Id.* at 70.) However, at other points, Williams has claimed that another woman, Jacqueline Mack, also worked in the department. (ECF No. 53-1, 208.) These contradictions make it impossible to infer that the alleged harassment, itself largely unsupported in the record, was based on sex.

Regarding the exact harassment she faced, Williams initially identified only "dirty looks" and the conversation Newbern allegedly had with Nakia Rutherford. In her deposition, she acknowledged that neither Newbern nor Page was ever sexually aggressive to her or made any sexually derogative comments directly to her. (*Id.* at 187-190.) When asked if they ever insulted her based on her gender, Williams stated that the "most derogatory" statement Newbern made to her was that because she was a woman, she should not have to use the bathroom as much as she did. (*Id.* at 69.) The only gendered insult not contained in hearsay and supported by the record – that Newbern once called a different employee a "bitch" in conversation – is sexist and inappropriate, but it is well settled law that "isolated incidents, . . . unless extremely serious, will not amount to discriminatory changes in the terms or conditions of employment." *Hickman v. Laskodi*, 45 F. App'x 451, 454 (6th Cir. 2002) (citing *Bowman*, 220 F.3d at 463). Williams also

does not allege any physical intrusion, which "is more severe than harassing comments alone." *Wyatt v. Nissan North Am., Inc.*, 999 F.3d 400, 411 (6th Cir. 2021) (quoting *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 334 (6th Cir. 2008)). The supported, undisputed material facts suggest that at most, Williams had her bathroom breaks monitored, was subjected to "dirty looks," unspecified "constant nitpicking," and that Nakia Rutherford was told by Newbern that he should be wary of her because she had filed charges in the past. Far more egregious fact patterns have been found to be insufficient to show the existence of a material fact regarding hostile work environments. *See Ault*, 620 F. App'x at 400-01 (collecting cases); *Clay v. United Parcel Service, Inc.*, 501 F.3d 695, 707-708 (6th Cir. 2007) (unequal criticism and job duties paired with refusal to remove from a position that caused serious injury not a hostile work environment); *Burnett v. Tyco Corp.*, 203 F.3d 980, 983 (6th Cir. 2000) ("A single battery coupled with two merely offensive remarks over a six-month period does not create an issue of material fact as to whether the conduct alleged was sufficiently severe to create a hostile work environment"). Even drawing all inferences in Williams' favor, including accepting unsupported later testimony that the court is not obligated to consider as adequate evidence at Summary Judgment, the record would show that there are disagreements and disputes over whether Williams faced some degree of bullying at work, but not that said bullying was due to her sex. The verbal abuse seemed to be directed towards all of the employees. Also, the record shows that, if there were double standards, they were not severe and pervasive enough to constitute a hostile work environment.

Further, even if Williams had established that a hostile work environment existed, MLGW could assert an affirmative defense. The Supreme Court has found that employers may defend against claims of hostile work environments (where the harassment did not include tangible

employment actions)[11] by demonstrating "(a) that [they] exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (b) that plaintiff unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." *Thornton v. Federal Express Corp.*, 530 F.3d 451, 456 (6th Cir. 2008) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998)). MLGW notes that upon receiving Williams' complaints (which the record shows did not include the majority of the now-alleged harassment), they immediately opened an investigation and agreed to transfer Williams away from her alleged harassers if she so desired. (ECF No. 53-13, 3) ("The reason Ms. Williams was temporarily moved was because she expressed concern about her working environment. The answer as to when she will be allowed to return rest [sic] with her. If she tells me that she now feels comfortable going back we can make it happen.") It was only at Williams' request and prompting that she returned to Newbern's supervision, which she claims was due to general difficulties she had performing her job at the new location. (ECF No. 53-1, 119 – 125.) The undisputed facts are that MLGW both investigated the allegations presented to them and provided Williams with a preventative opportunity to avoid harm while the investigation was ongoing. This investigation produced no corroboration of Williams' claims of harassment beyond confirming that Newbern once had a private conversation with Nakia Rutherford about her. Further, there is no evidence Williams reported claims of harassment beyond "dirty looks," the conversation with Rutherford, and general allegations that Newbern and Page spoke badly about her. Williams has never even alleged that she reported her claims of unequal lunches, breaks, or cell phone usage to MLGW. She did not cite these allegations in either her EEOC Charge or Amended EEOC Charge. She only identified the conversation with Nakia Rutherford as the basis for her complaint.

---

[11] As Newbern was not involved in the decision to suspend Williams, this adverse action was not part of the alleged harassment, and Williams does not argue that it was.

(ECF No. 1-12, 2 – 3.) Based on the record, there are no disputed material facts. MLGW investigated Williams' claims, ultimately found them wanting, and nevertheless offered her an accommodation to no longer be immediately supervised by Newbern.

In sum, there are no material factual disputes regarding Williams' claim of experiencing a hostile work environment based on sex. Much of her case rests solely on uncorroborated testimony that is often internally inconsistent and does not establish a sexual basis for the harassment. The record further supports that MLGW both exercised reasonable care to correct any perceived harassment by providing Williams with an opportunity to relocate that Williams ultimately and unreasonably declined. *See Thornton*, 530 F.3d at 457 ("plaintiff was offered the opportunity to return to work under supervision of a different manager involving courier routes within her scheduled preferences. In other words, plaintiff's eventual use of the harassment policy complaint procedure yielded the offer of a remedy that would have potentially cured both stress-producing conditions.") Accordingly, MLGW's Motion on this claim must be **GRANTED.**

> c. *Retaliation*

Williams also asserts a claim of Title VII retaliation, which proceeds according to a familiar burden-shifting framework. To make an initial *prima facie* case of Title VII retaliation, "an employee must show '(1) [s]he engaged in protected activity, (2) the employer knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken against the employee, and (4) there was a causal connection between the protected activity and the adverse employment action.'"[12] *Laughlin v. City of Cleveland*, 633 F. App'x 312, 315 (6th Cir. 2015) (quoting *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008)).

---

[12] A plaintiff may avoid this with direct evidence of discrimination. *Imwalle v. Reliance Medical Products, Inc.*, 515 F.3d 531, 538 (6th Cir. 2008). Williams states that "Plaintiff has established by direct evidence in support of her claim under Title VII discrimination" but does not specify the evidence to which she refers. Since Williams does not advance an argument on this point the Court will disregard it.

Not surprisingly, MLGW argues that Williams has not met the fourth prong of the test and cannot demonstrate that her charges caused either the suspension or the deficient performance review. MLGW contends Williams presents no evidence that either the suspension or the review were retaliation for the complaints. They note that when asked why she believed the two were retaliatory in her deposition, she could only offer conclusory statements. (ECF No. 47, 18) (Q: "And you think that false – them calling them false allegations is really just retaliation?" A: Well, she pretty much told me that I didn't feel threatened, so you can't - - she told me about my experience, what I felt. Instead of helping me to resolve the problem, they punished me for it. That's retaliation.")

For her part, Williams only offers one argument related to causation. She states that temporal proximity between her charges and the suspension and performance review is adequate at this point to establish causation due to the fact that performance reviews are only conducted once a year. "Newbern issued his devastating review as soon as he could as they were only given out yearly. These facts combined establish a causal relationship between the complaints filed by Plaintiff and the negative employment action." (ECF No. 53, 19.) There are four distinct events relevant to the temporal proximity argument: Williams' internal charge in April 2018, Williams' suspension in August 2018, Williams' EEOC Charge subsequent to her suspension in August 2018, and Williams' performance review in February 2019. There is a four month gap between her internal charge and suspension, and a six month gap between her EEOC charge and performance review, with a consequent ten month gap between the internal charge and review.

The Sixth Circuit is clear that "temporal proximity alone in the absence of other direct or compelling circumstantial evidence is generally not sufficient to support a finding of causal connection." *Barrett v. Lucent Technologies, Inc.*, 36 F. App'x 835, 843 (6th Cir. 2002) (citing

*Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000)). The Sixth Circuit has also previously found that gaps of two to five months, absent additional evidence, do not support a triable issue of causation. *See Hafford v. Seidner*, 183 F.3d 506, 515 (6th Cir. 1999). The gaps here are much longer. Williams would need additional evidence of causation to establish a *prima facie* case of retaliation, which she has not presented. As noted above, her brief, deposition testimony, and declaration add very little beyond her own speculation. Williams rests her retaliation argument solely on the idea that "the Sixth Circuit has held that more evidence is required only when some time has passed." (ECF No. 53, 19.) Unfortunately, she misreads Sixth Circuit law. Accordingly, MLGW's Motion for Summary Judgment on this claim must be **GRANTED**.

> d. *Retaliatory Harassment*

Williams also advances a claim of "retaliatory harassment." The test for such a claim is identical to a general retaliation claim, except instead of showing that the employer took an adverse employment action against a plaintiff after they engaged in a protected activity, the plaintiff must show that the employer "subjected the plaintiff to severe or pervasive retaliatory harassment by a supervisor[.]" *Wyatt v. Nissan North Am., Inc.*, 999 F.3d 400, 419 (6th Cir. 2021). "The standard for actionable harassment is the same in the retaliation context as in the sexual discrimination context." *Id.* at 426 (quoting *Broska v. Henderson*, 70 F. App'x 262, 269 (6th Cir. 2003)). Williams' argument on this point is identical to that of her hostile work environment claim. (ECF No. 53, 19 – 20.)

Because of this, the argument contains the same issues regarding severity and pervasiveness as addressed above. However, the argument is also undercut by the causation prong. Williams alleges that the harassment began before she filed her internal charges. (ECF No.

53-1, 95 – 96.) Following this, the only alleged harassment stated to have arisen after the complaint is Newbern taking Williams' supply room keys and giving them to Sam Tinsely. As noted above, this appears to be an isolated incident that is neither severe nor pervasive. (ECF No. 53-14, 5.)[13]

Retaliation claims are judged under a "but-for" causation standard. *Davis v. Metro Parks and Recreation Dep't*, 854 F. App'x 707, 714 (6th Cir. 2021). This means that the alleged harassment would not have taken place but for Williams engaging in a protected activity. In this case, that protected activity was Williams filing her internal and external charges. But Williams' testimony and the record are clear that she alleges this behavior began before the charges were filed, for reasons *other* than her protected activity. (ECF No. 53-1, 108.) (Q: "And then you state in this next paragraph 'All of this animosity towards me stemmed from me not feeling comfortable doing their supervisor job duties?'" A: "That's correct."). Thus, the protected activity cannot be a but-for cause of the harassment she claims she faced. The record is unclear in that it does not differentiate between what Williams believes was caused by her protected activity and what she believes was due to her sex. Thus, it is impossible for the Court to draw any reasonable inferences that the harassment was caused by her charges. Indeed, the supported material facts, and Williams herself, suggest that it was not. Accordingly, MLGW's Motion on this claim is **GRANTED**.

## IV.    CONCLUSION

For the reasons above, MLGW's Motions to Strike are **GRANTED IN PART** and **DENIED IN PART**. Their Motion for Summary Judgment is **GRANTED** as well.

---

[13] Williams never identifies when the harassment began, although in her first email to Paula Mitchell she noted she believed it was because she refused to fill out performance evaluations, which she was ordered to do in April 2018 before filing the charges.

**IT IS SO ORDERED** on this the 8th day of June 2023.

_**s/John T. Fowlkes, Jr.**_
JOHN T. FOWLKES, JR.
UNITED STATES DISTRICT JUDGE